**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

```
JOHN BRANDT,                      :
                                  :    Civil Action No. 10-4223 (FLW)
              Plaintiff,          :
                                  :
         v.                       :    OPINION
                                  :
EVAN FEIBUSCH, et al.,            :
                                  :
              Defendants.         :
```

**APPEARANCES:**

Plaintiff pro se
John Brandt
Ann Klein Forensic Center
West Trenton, NJ 08628

**WOLFSON**, District Judge

Plaintiff John Brandt, a civilly-committed mental patient confined in New Jersey, seeks to bring this action in forma pauperis pursuant to 42 U.S.C. § 1983, alleging violations of his constitutional rights.

Pursuant to 28 U.S.C. § 1915(e)(2), this Court previously screened the initial Complaint, dismissing certain claims and permitting certain others to proceed, and granting Plaintiff leave to file an Amended Complaint addressing the deficiencies of the original Complaint. Thereafter, Plaintiff filed an Amended Complaint [9]. This matter is again before the Court pursuant to the Motion [22] of the remaining defendants to dismiss the

Amended Complaint for failure to state a claim or, in the alternative, for summary judgment.

I. <u>BACKGROUND</u>

The following factual allegations are taken from Plaintiff's Amended Complaint, or from sources of which this Court may take judicial notice,[1] and are accepted as true for purposes of this review.

In 2001, Plaintiff was charged, in two indictments, with burglary, criminal mischief, and criminal trespass.  He was subsequently diagnosed with bipolar disorder, manic type with psychotic features, and with an antisocial personality disorder. In 2003, the trial judge found him competent to stand trial on both indictments and not guilty by reason of insanity.

_____

[1] This Court will take judicial notice of the dockets of this and other courts in cases related to this Amended Complaint. <u>See</u> Fed.R.Evid. 201; <u>Southern Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group Ltd.</u>, 181 F.3d 410, 426-27 (3d Cir. 1999) (federal court, on a motion to dismiss, may take judicial notice of another court's opinion, not for the truth of the facts recited therein, but for the existence of the opinion, which is not subject to reasonable dispute over its authenticity).  Thus, this Court will take judicial notice of, among other documents, the state court order regarding Plaintiff's transfer, upon which Plaintiff relies in the Amended Complaint.  <u>See</u>, <u>e.g.</u>, <u>Brandt v. Monroe</u>, Civil No. 05-3386, 2006 WL 1468394 (D.N.J. May 24, 2006); <u>Pension Benefit Guaranty Corp. v. White Consolidated Industries, Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993) ("We now hold that a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document. ... Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document on which it relied.").

Thereafter, he was involuntarily committed and placed on Krol[2]
status.  He remains committed and on Krol status as the result of
the required periodic reviews.  See generally Brandt v. McQuaide,
2010 WL 5343233 (D.N.J. Dec. 20, 2010) and In the Matter of the
Commitment of J.B., 2009 WL 1658494 (N.J.Super. App.Div. June 16,
2009).

In the Amended Complaint, Plaintiff alleges that, at a Krol
status hearing apparently in late 2008, it was determined that he
was entitled to be transferred from Ann Klein Forensic Center
("AKFC") to a hospital in a less restrictive setting for the
purposes of treatment.[3]  Plaintiff alleges that after another
Krol status hearing, on January 5, 2009, the presiding judge
ordered him to be transferred to a less restrictive setting
immediately or as soon as possible.  The most recent referenced
order reads, in pertinent part:

IT IS, on this 16th day of JAN, 2009,

...

---

[2] See State v. Krol, 68 N.J. 236, 344 A.2d 289 (1975)
(detailing periodic review procedures for persons found not
guilty by reason of insanity and committed for mental health
treatment); N.J.S.A. 2C:4-8(b)(3) ("If the court finds that the
defendant cannot be released with or without supervision or
conditions without posing a danger to the community or to
himself, it shall commit the defendant to a mental health
facility approved for this purpose by the Commissioner of Human
Services to be treated as a person civilly committed.").

[3] None of the parties have provided the Court with a copy of
this order.

3

ORDERED that John Brandt is remanded to the Ann Klein Forensic Center until such time as his case is approved by the Clinical Administrative Review Panel for transfer; and it is further

ORDERED that with the approval of the Clinical Administrative Review Panel, John Brandt may be transferred to a psychiatric hospital with a less restrictive setting as soon as possible; and it is further

ORDERED that John Brandt cooperate with his treating psychiatrist and treatment team; and it is further

ORDERED that John Brandt shall take his medications as prescribed by his treating psychiatrist; and it is further

ORDERED that John Brandt may receive his medication intramuscularly if he refuses to take it orally; and it is further

ORDERED that if John Brandt's condition should deteriorate between now and the next review date, the treatment team shall immediately notify the Bergen County Prosecutor's Office so that the State can make an emergent application to place him in a more restrictive setting; ...

(Motion to Dismiss, Certification of David L. DaCosta, Ex. G.)

Plaintiff alleges that the Clinical Administrative Review Panel approved his transfer to Trenton Psychiatric Hospital ("TPH") on January 16, 2009, based upon the late 2008 order, but that he was not transferred to a less restrictive setting at TPH until March 17, 2009,[4] which he characterizes as an unreasonable

---

[4] In the Amended Complaint, Plaintiff asserted that he was not transferred until April 17, 2009, but in his response to the Motion to Dismiss, he agrees that he was transferred, as Defendants assert, on March 17, 2009.

4

delay, not based on professional judgment, that deprived him of
his right to be treated in the least restrictive environment.
Plaintiff alleges that Defendants Evan Feibusch, Trenton
Psychiatric Hospital Chief Psychiatrist, and Lawrence Rossi, TPH
Medical Director, delayed his transfer, not in the exercise of
their professional judgment, but in retaliation for previous
civil rights litigation instituted by Plaintiff.  In support of
this contention, Plaintiff alleges generally that other patients,
similarly situated[5] or more dangerous, are usually transferred in
two to four weeks.

Defendants attach to their Motion copies of e-mail
correspondence between state officials regarding the Clinical

---

[5] To the extent Plaintiff seeks, by the use of the phrase
"similarly situated," to assert an equal protection claim, the
Court notes that the Amended Complaint fails to explicitly assert
such a claim and fails completely to allege any facts that would
establish that any other patients are similarly situated to
Plaintiff with respect to the circumstances related to their
transfer from one psychiatric facility to another.  To the
contrary, the requirement of individualized judicial reviews for
Krol patients belies any suggestion that they are similarly
situated for the purpose of treatment decisions.

In his opposition to the Motion to Dismiss, Plaintiff
asserts for the first time a "class of one" equal protection
claim, in which he asserts that Defendants Rossi and Feibusch
were motivated to oppose his transfer to TPH solely in
retaliation for his litigation and not for any legitimate reason.
However, the Court of Appeals for the Third Circuit has held that
"'[a] pure or generic retaliation claim [] simply does not
implicate the Equal Protection Clause.'"  Thomas v. Independence
Twp., 463 F.3d 285, 298 n.6 (3d Cir. 2006) (citations omitted).
Accordingly, the Amended Complaint fails to state an equal
protection claim.

Administrative Review Panel's consideration of Plaintiff's transfer, pursuant to the state court order, as well as the authenticating certification of Evan Feibusch. Those documents reflect that, on January 30, 2009, TPH received a request from CARP for Plaintiff's transfer. On February 5, 2009, at 2:38 p.m., Defendant Evan Feibusch suggested to Defendant Lawrence Rossi that they formally ask CARP to revisit their approval to transfer Plaintiff to TPH, based on incidents that occurred in December 2008 and on January 23, 2009, only a few days prior to the CARP review. On February 5, 2009, at 3:03 p.m., Laurence Rossi forwarded to CARP a request for review based upon the referenced incidents, which reads in its entirety:

> We have serious questions about the appropriateness of the referral of Mr. Brandt from AKFC to TPH. CARP approved the referral on 1/27/09 but the patient was involved in an incident on 1/23/09 and he was placed in seclusion. As you know we do not use seclusion at TPH and we are concerned that Mr. Brandt is not stable enough to reside with our patient population in the more open, less restrictive environment at TPH.
>
> I am requesting a review of the patient's current clinical status by CARP and appropriateness of his tranfser to TPH given the recent incident on 1/23/09 as well as his involvement in another incident on 12/21/08 when he assaulted a peer.

(Motion to Dismiss, Ex. M.) On February 20, 2009, an internal e-mail reflected that Lawrence Rossi had been advised that CARP officials had been assigned to evaluate Plaintiff and to speak to his team at AKFC that same afternoon and that CARP would review the transfer to a less restrictive setting the next week.

6

On March 4, 2009, Defendant Dr. Rossi sent an e-mail to a CARP official reflecting the results of a meeting including Plaintiff, TPH clinical staff, and AKFC clinical staff two days earlier.[6]  After discussing Plaintiff's diagnoses, the memo continued as follows:

> The team from TPH is of the opinion that Mr. Brandt has shown improvement in controlling his aggressive outbursts to the extent that he has not injured anyone recently but assess him as a high risk to become aggressive if he were frustrated.  His most recent episodes of aggressive behaviors in December and January were responses to arguments amongst a group of patients in December and a patient who was cognitively impaired becoming intrusive.  In both cases Mr. Brandt felt perfectly justified in his responses.
>
> The TPH team's conclusion is that he has a personality disorder, will remain a risk to act out impulsively and is perhaps less violent because he has realized that it is his only way out of AKFC.  We are concerned that because we have regressed, psychotic and cognitively impaired patients on all units and throughout the hospital that our patients and our staff will be at risk.  We also were concerned that if he made a decision to elope, it would be more likely from TPH than any of the other options, as APH has Holly Hall, GPPH has an enclosed setting both have Security Guards at the doors, or AKFC which is very secure.
>
> Given the violence risks, elopement risks, and lack of efficacious treatment modalities we can provide for Antisocial Personality Disorder, if we are required to take him we will make arrangements as soon as a bed is available in Lincoln.

---

[6] It is undisputed for purposes of the Motion that neither Evan Feibusch nor Lawrence Rossi personally examined Plaintiff in connection with the 2008-2009 transfer to TPH until March 2009.

(Motion to Dismiss, Ex. M.)  CARP made a final decision on March 11, 2009, that Plaintiff would be admitted to TPH; he was admitted to TPH on March 17, 2009.

Plaintiff alleges that, after an initial evaluation in the Lincoln unit at TPH, he was placed in the Raycroft East-2 unit where he was progressing "fairly well."  Plaintiff alleges that defendants Evan Feibusch and Lawrence Rossi frustrated his progress, and that he therefore brought a civil rights action challenging his placement.  See Brandt v. Trenton Psychiatric Hospital, Civil No. 09-5367 (D.N.J.).  Plaintiff alleges that as a result of this litigation he was labelled a "troublemaker" by some staff members.  (Amended Complaint ¶ 29.)

Plaintiff alleges that in February 2010, patients on Raycroft East-2 began to complain that they did not receive regular outside breaks and daily exercise.  In particular, Plaintiff alleges that a patient James Rich threatened to assault Defendant Nursing Supervisor Qued Burke Green, who called police.  Once the Department of Human Services Police arrived, Defendant Green said she could deal with patient James Rich, but that she couldn't deal with Plaintiff.  She discussed with the police Plaintiff's pending civil rights lawsuit, but stated that she was not worried about being sued.  Plaintiff alleges that Defendant Green and Defendant Nurse Urajale Akajabi had been trying to hold Plaintiff responsible for the other patients' complaints.

Plaintiff alleges that Defendant Program Coordinator Jackie Porter met with him and another patient James Edwards and asked them whether they could "control the other patients' behavior that were creating problems, or complaining about grievances and lawsuits," (Amended Complaint, ¶ 37, but that Plaintiff refused to get involved in that.

Plaintiff alleges that several days later he was "speaking with" about five fellow patients near the nurses' station, discussing an incident he was involved in at another hospital years earlier, and that he was transferred to AKFC because of it. Plaintiff alleges that Nurse Akajabi, who was present at the nurses' station, wrote a false incident report about the event, claiming that Plaintiff had threatened her.  Plaintiff got upset about this and asserted that he did not threaten her and that she was lying.  Using his personal computer and printer, Plaintiff then filed a grievance against Nurse Akajabi and Supervisor Green.  Plaintiff alleges that he then met with Defendant Program Coordinator Jackie Porter and another staff member, Mike Green, who confirmed that Plaintiff had not threatened Nurse Akajabi. Plaintiff alleges that the facility did not conduct an adequate investigation or appropriately discipline Nurse Akajabi.

Copies of patient records attached to the Motion to Dismiss reflect several team meetings with Plaintiff in February and March 2010 to discuss the incidents he describes, as well as

other issues, including conflict between Plaintiff and staff, and between Plaintiff and other patients, and also including another patient's allegations that Plaintiff was instigating other patients to be more aggressive and that Plaintiff was threatening and abusive to nursing staff.  Those records reflect Plaintiff's assertion that he was not threatening Ms. Akajabi, but that she misinterpreted a conversation he was having with another patient about a previous incident at AKFC.[7]  Those records also reflect Plaintiff's frustration and concern that staff complaints against him would affect his level of supervision.

Plaintiff alleges that about a week after the incident with Nurse Akajabi, he met with his treatment team and was advised that he was doing well and that there was no change in his treatment status.  However, later the same day, or the next day, Team psychiatrist Abdul Kazi informed Plaintiff that he was being administratively transferred to the Intensive Treatment Unit.

Plaintiff asserts that Defendants Evan Feibusch and Lawrence Rossi transferred Plaintiff to ITU without personally examining him, as allegedly required by N.J.S.A. 30:4-24.2d(3).[8]  Plaintiff

---

[7] In addition, Plaintiff has submitted the affidavit of a patient who was present at the time of the conflict with Nurse Akajabi, who attests that Plaintiff was not threatening to her.

[8] N.J.S.A. 30:4-24.2d(3) provides:

d.  Each patient in treatment shall have the following rights, ...

10

also alleges that his transfer to ITU was not medically necessary.

Hospital records attached to the Motion to Dismiss reflect that on March 1, 2010, after a team meeting with Plaintiff, a staff member (Ms. Champagne) asked Dr. Kazi to transfer Plaintiff to the Lincoln Unit because of conflict on the Raycroft East-2 Unit; Dr. Kazi asked for Dr. Feibusch's approval.  Dr. Feibusch responded, "As per our discussion on Monday, transferring him is fine with me as long as the team feels it is clinically indicated." (Motion, Ex. K (emphasis added).)  Plaintiff was

---

(3)  To be free from physical restraint and isolation. Except for emergency situations, in which a patient has caused substantial property damage or has attempted to harm himself or others and in which les restrictive means of restraint are not feasible, a patient may be physically restrained or placed in isolation only on a medical director's written order or that of his physician designee which explains the rationale for such action.  The written order may be entered only after the medical director or his physician designee has personally seen the patient concerned, and evaluated whatever episode or situation is said to require restraint or isolation.  Emergency use of restraints or isolation shall be for no more than 1 hour, by which time the medical director or his physician designee shall have been consulted and shall have entered an appropriate order in writing.  Such written order shall be effective for no more than 24 hours and shall be renewed if restraint and isolation are continued.  While in restraint or isolation, the patient must be bathed every 12 hours and checked by an attendant every 2 hours with a notation in writing of such checks placed in the patient's treatment record along with the order for restraint or isolation.

transferred to the Lincoln Unit, Intensive Treatment Unit, the next day.

Plaintiff alleges that in ITU, he was placed under "harsher" conditions of confinement, more specifically, that he no longer had a single room with a private bathroom, that his personal belongings (including computer and printer) and hygiene products were confiscated from him, and that he could not participate in his treatment programs.  Plaintiff alleges that there are no policies regarding the circumstances justifying transfer of a patient to the Intensive Treatment Unit and that the ITU is where the hospital places patients who are problematic, dangerous, or severely psychotic.  Plaintiff alleges that there is insufficient supervision of the patients in the ITU.  Plaintiff alleges that patients in the ITU do not have daily contact with the general population of TPH, as do patients in other wards.

Plaintiff alleges that "Defendant Jackie Porter, Urajaler Akajabi, Qued Burke Green, Lawrence Rossi, and Evan Feibush all have acted together to conspire by advice, participation, concent [sic], and approval to deprive plaintiff of a constitutional right by transferring him to the Intensive Treatment Unit "ITU" because of him filing lawsuits and grievances."  (Amended Complaint, ¶ 44.)  After his transfer, he became upset and broke

several windows in the ITU dayroom, after which he was transferred back to AKFC.[9]

Plaintiff asserts the following claims:  (Count I) Defendants Evan Feibusch and Lawrence Rossi violated Plaintiff's Fourteenth Amendment due process rights by delaying his transfer from AKFC to TPH because of his litigious reputation, as demonstrated by the fact that more dangerous patients were transferred more quickly; (Count II) Defendants Evan Feibusch and Lawrence Rossi delayed Plaintiff's transfer in retaliation for Plaintiff's prior litigation and for Defendant Feibusch appearing as an expert witness in one of those cases; (Count III) all defendants conspired to deprive Plaintiff of his due process right to treatment in the least restrictive setting by transferring him to ITU; (Count IV) all defendants conspired to transfer Plaintiff to ITU, where he would not have a computer and printer, in retaliation for his grievances and litigation; (Count V) Nurse Akajabi departed from her duty to treat Plaintiff with professional judgment when she fabricated a report that he had threatened her; (Count VI) Nurse Akajabi retaliated against Plaintiff when she fabricated a report that he had threatened her; (Count VII) Defendants Evan Feibusch and Lawrence Rossi violated Plaintiff's due process rights when they transferred him

---

[9] Plaintiff does not challenge the transfer back to AKFC.

to ITU in violation of liberty rights created by the state in
N.J.S.A. 30:4-24.2d(3) and 30:4-24.2e(2).[10]

Plaintiff seeks declaratory relief, monetary damages, and
injunctive relief in the form of an order compelling defendants
to comply with the Constitution.  Plaintiff brings his claims for
damages against the defendants in their individual capacities.
Plaintiff brings his claims for injunctive relief against the
defendants in their official capacities.

All defendants have moved to dismiss the Amended Complaint
for failure to state a claim or, in the alternative, for summary
judgment.[11]  Plaintiff has responded and this Motion [22] is now
ready for decision.

## II.  DISMISSAL FOR FAILURE TO STATE A CLAIM

This Court must dismiss, at any time, certain in forma
pauperis actions that are frivolous, malicious, fail to state a

---

[10] N.J.S.A. 30:4-24.2e(2) provides that each patient has the
right "[t]o the least restrictive conditions necessary to achieve
the purposes of treatment."

[11] The Court notes that the alternative motion, for summary
judgment, is being made before the completion of discovery and is
supported by documents (medical and business records) beyond
those which this Court would consider on a motion to dismiss.
Plaintiff has not objected to the early motion for summary
judgment nor argued that he cannot present facts essential to his
opposition to the motion.  See Fed.R.Civ.P. 56(d).  To the
contrary, he has supported his opposition with an affidavit from
another patient.  Accordingly, to the extent this Court cannot
rule on the Motion to Dismiss, based upon the arguments and
supporting documentation, it will consider the alternative Motion
for Summary Judgment.

claim, or seek monetary relief from a defendant who is immune from such relief.  See 28 U.S.C. § 1915(e)(2).  See also Fed.R.Civ.P. 12(b)(6), permitting a party to move to dismiss a claim in a civil action for "failure to state a claim upon which relief can be granted."

In determining the sufficiency of a pro se complaint, the Court must be mindful to construe it liberally in favor of the plaintiff.  Haines v. Kerner, 404 U.S. 519, 520-21 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992).  The Court must "accept as true all of the allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff."  Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997).

Rule 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint must plead facts sufficient at least to "suggest" a basis for liability.  Spruill v. Gillis, 372 F.3d 218, 236 n.12 (3d Cir. 2004).  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'"  Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citations omitted).

> While a complaint ... does not need detailed factual
> allegations, a plaintiff's obligation to provide the
> "grounds" of his "entitle[ment] to relief" requires
> more than labels and conclusions, and a formulaic
> recitation of the elements of a cause of action will
> not do, see Papasan v. Allain, 478 U.S. 265, 286, 106

15

S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to
dismiss, courts "are not bound to accept as true a
legal conclusion couched as a factual allegation").
Factual allegations must be enough to raise a right to
relief above the speculative level ... .

Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007)

(citations omitted).

The Supreme Court has demonstrated the application of these

general standards to a conspiracy claim.

In applying these general standards to a
[conspiracy] claim, we hold that stating such a claim
requires a complaint with enough factual matter (taken
as true) to suggest that an agreement was made. Asking
for plausible grounds to infer an agreement does not
impose a probability requirement at the pleading stage;
it simply calls for enough fact to raise a reasonable
expectation that discovery will reveal evidence of
illegal agreement. And, of course, a well-pleaded
complaint may proceed even if it strikes a savvy judge
that actual proof of those facts is improbable, and
"that a recovery is very remote and unlikely." ... It
makes sense to say, therefore, that an allegation of
parallel conduct and a bare assertion of conspiracy
will not suffice. Without more, parallel conduct does
not suggest conspiracy, and a conclusory allegation of
agreement at some unidentified point does not supply
facts adequate to show illegality. Hence, when
allegations of parallel conduct are set out in order to
make a [conspiracy] claim, they must be placed in a
context that raises a suggestion of a preceding
agreement, not merely parallel conduct that could just
as well be independent action.

The need at the pleading stage for allegations
plausibly suggesting (not merely consistent with)
agreement reflects the threshold requirement of Rule
8(a)(2) that the "plain statement" possess enough heft
to "sho[w] that the pleader is entitled to relief." A
statement of parallel conduct, even conduct consciously
undertaken, needs some setting suggesting the agreement
necessary to make out a [conspiracy] claim; without
that further circumstance pointing toward a meeting of

16

> the minds, an account of a defendant's commercial
> efforts stays in neutral territory. ...

Twombly, 550 U.S. at 556-57 (citations and footnotes omitted).

The Court of Appeals for the Third Circuit has held that the Twombly pleading standard applies in the context of a § 1983 civil rights action. See Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("we decline at this point to read Twombly so narrowly as to limit its holding on plausibility to the antitrust context").

> Context matters in notice pleading. Fair notice under
> Rule 8(a)(2) depends on the type of case -- some
> complaints will require at least some factual
> allegations to make out a "showing that the pleader is
> entitled to relief, in order to give the defendant fair
> notice of what the ... claim is and the grounds upon
> which it rests." Indeed, taking Twombly and the
> Court's contemporaneous opinion in Erickson v. Pardus,
> 127 S.Ct. 2197 (2007), together, we understand the
> Court to instruct that a situation may arise where, at
> some point, the factual detail in a complaint is so
> undeveloped that it does not provide a defendant the
> type of notice of claim which is contemplated by
> Rule 8. Put another way, in light of Twombly, Rule
> 8(a)(2) requires a "showing" rather than a blanket
> assertion of an entitlement to relief. We caution that
> without some factual allegation in the complaint, a
> claimant cannot satisfy the requirement that he or she
> provide not only "fair notice," but also the "grounds"
> on which the claim rests.

Phillips, 515 F.3d at 232 (citations omitted).

More recently, the Supreme Court has emphasized that, when assessing the sufficiency of any civil complaint, a court must distinguish factual contentions -- which allege behavior on the part of the defendant that, if true, would satisfy one or more

17

elements of the claim asserted -- and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009). Although the Court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." Id. at 1950. Thus, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.

> Therefore, after Iqbal, when presented with a motion to dismiss for failure to state a claim, district courts should conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The District Court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions. Second, a District Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a "plausible claim for relief." In other words, a complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to "show" such an entitlement with its facts. See Phillips, 515 F.3d at 234-35. As the Supreme Court instructed in Iqbal, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not 'show[n]'-'that the pleader is entitled to relief.'" This "plausibility" determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citations omitted).

III.   <u>SUMMARY JUDGMENT</u>

A.   <u>Federal Rule of Civil Procedure 56</u>

A district court shall grant summary judgment, as to any claim or defense, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).

A party asserting that a fact cannot be, or is genuinely disputed, must support the assertion by citing to particular parts of materials in the record, or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.  Fed.R.Civ.P. 56(c)(1).  Nevertheless, the court may consider other materials in the record.  Fed.R.Civ.P. 56(c)(3).

Rule 56(e) of the Federal Rules of Civil Procedure further provides that:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1)   give an opportunity to properly support or address the fact;
>
> (2)   consider the fact undisputed for purposes of the motion;
>
> (3)   grant summary judgment if the motion and supporting materials - including the facts considered undisputed - show that the movant is entitled to it; or

19

(4)   issue any other appropriate order.

Fed.R.Civ.P. 56(e).

No genuinely triable issue of material fact exists when the
moving party demonstrates – based on the submitted evidence, and
viewing the facts in the light most favorable to the non-moving
party – that no rational jury could find in the non-movant's
favor.  Ambruster v. Unisys Corp., 32 F.3d 768, 777 (3d Cir.
1994).  Thus, the threshold enquiry is whether "there are any
genuine factual issues that properly can be resolved only by a
finder of fact because they may reasonably be resolved in favor
of either party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
250 (1986).  In deciding whether triable issues of material fact
exist, a court must view the underlying facts and draw all
reasonable inferences in favor of the non-moving party.  See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986); Pennsylvania Coal Ass'n v. Babbitt, 63 F.3d 231, 236
(3d Cir. 1995); Hancock Indus. v. Schaeffer, 811 F.2d 225, 231
(3d Cir. 1987).

The rule does not increase or decrease a party's ultimate
burden of proof on a claim.  Rather, the moving party bears the
burden of showing no genuine issue of material fact, and the non-
movant opposes the motion by presenting affirmative evidence to
the contrary.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
256-57 (1986).  Under the Rule, once the moving party has

20

properly supported its showing of no triable issue of fact and of
an entitlement to judgment as a matter of law, "its opponent must
do more than simply show that there is some metaphysical doubt as
to the material facts." Matsushita, 475 U.S. at 586 (citations
omitted). See also Anderson, 477 U.S. at 247-48 ("By its very
terms, this standard provides that the mere existence of some
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no genuine issue of material
fact.").

    What the non-moving party must do is "go beyond the
pleadings and by [its] own affidavits, or by the 'depositions,
answers to interrogatories, and admissions on file,' designate
'specific facts showing that there is a genuine issue for
trial.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); see
also Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990)
("The object of [former Rule 56(e), new Rule 56(c)] is not to
replace conclusory allegations of the complaint ... with
conclusory allegations of an affidavit."); Anderson, 477 U.S. at
249; Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358,
1363 (3d Cir. 1992), cert. denied, 507 U.S. 912 (1993) ("To raise
a genuine issue of material fact, ... the opponent need not
match, item for item, each piece of evidence proffered by the

movant," but must "exceed[] the ' mere scintilla' threshold and
... offer[] a genuine issue of material fact.").

A movant need not affirmatively disprove the other party's
case; he may move on the ground that the non-movant lacks
evidence "sufficient to establish the existence of an element
essential to that party's case." Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986).  Nevertheless, again, it is not
sufficient to support a motion with only conclusory assertions
that the non-movant has no evidence to prove his case.  To the
contrary, as Justice White warned, in his concurring opinion in
Celotex, "It is the defendant's task to negate, if he can, the
claimed basis for the suit." Celotex, 477 U.S. at 328 (Justice
White, concurring).  Celotex's progeny reflects that sentiment –
that the movant bears the burden of demonstrating the lack of
evidence in the record to support the non-movant's claims.  See,
e.g., Haywood v. Nye, 999 F.Supp. 1451, 1463 (D. Utah 1998);
Andrews v. Crump, 984 F.Supp. 393, 402-03 (W.D.N.C. 1996).

It is not necessary that the case be fully adjudicated on a
motion for summary judgment.

> If the court does not grant all the relief requested by
> the motion, it may enter an order stating any material
> fact - including an item of damages or other relief -
> that is not genuinely in dispute and treating the fact
> as established in the case.

Fed.R.Civ.P. 56(g).

B.   <u>New Jersey Local Civil Rule 56.1</u>

New Jersey Local Civil Rule 56.1(a), as amended in 2008, requires that on summary judgment motions, both the moving and non-moving parties furnish a statement identifying what each side deems to be the material facts, so that the Court can determine if a genuine dispute exists.  The commentary to the Rule notes that "the requirement of a separate document represents a change from the practice under the former version of the rule," and that "[t]he Rule 56.1 statement is viewed by the Court as a vital procedural step, since it constitutes and is relied upon as a critical admission of the parties."  The commentary specifies the content and format of the statement: e.g., the assertions must be set out in separately numbered paragraphs; each fact must be supported by a citation to an affidavit.

Consequences of a movant's noncompliance with the Rule can be severe–"[a] motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed."  L.Civ.R. 56.1(a).  <u>See also</u> <u>Kee v. Camden County</u>, 2007 U.S. Dist. LEXIS 23637, at *14 (D.N.J. 2007) (Simandle, Jr.); <u>Langan Eng'g & Envtl. Servs. v. Greenwich Ins. Co.</u>, 2008 U.S. Dist. LEXIS 99341 (D.N.J. 2008) (Greenaway, J.).  Where an opposition brief is not accompanied by a Rule 56.1 statement, the movant is not automatically entitled to summary judgment.  Instead, the judge "may enter summary judgment in favor of the moving party only if

23

the moving party has established that summary judgment is appropriate." Cornelio v. Coupon Serv. Corp., 2007 U.S. Dist. LEXIS 213, 15 *5 (D.N.J. 2007) (Pisano, J.). Such a scenario is predicated on the movant having filed a Rule 56.1 statement.

The Court is mindful of the fact that Plaintiff is a pro se litigant, and district court judges often relax procedural rules, including Local Civil Rule 56.1(a), for an unrepresented litigant. See, e.g., Jordan v. Allgroup Wheaton, 218 F.Supp.2d 643, 646 (D.N.J. 2002) (Irenas, J.), aff'd, 95 Fed.Appx. 462 (3d Cir. 2004) (pro se plaintiff's failure to submit a Rule 56.1 statement leads court instead to draw relevant facts "primarily from Plaintiff's complaint, and the transcript of Plaintiff's deposition testimony, Defendant's Statement of Undisputed Material Facts and supporting exhibits").

A court may excuse the failure to submit a Rule 56.1 statement where there is no evidence of bad faith. See, e.g., Rumbas v. Borough of Lawnside, 2008 U.S. Dist. LEXIS 60712 (D.N.J. 2008) (Simandle, Jr.); Shirden v. Cordero, 509 F.Supp.2d 461, 463-64 n.1 (D.N.J. 2007) (Martini, Jr.) (stating "lack of compliance with the Local Civil Rules has made it difficult and time-consuming for the Court to determine whether a genuine issue of material fact exists. Nonetheless, the Court, having found no evidence of bad faith, will decide Defendants' motion on its merits"). A judge may relax the Rule as well where the interests

24

of justice so require, which most commonly arises when both
parties fail to comply.  For example, in Kee v. Camden County,
2007 U.S. Dist. LEXIS 23637, at *16 (D.N.J. 2007), Judge Simandle
decided to adjudicate a summary judgment motion where "both
parties were equally lax in their compliance[,]" and where doing
so was "in the best interest of the parties and justice."
Nonetheless, before reaching this conclusion, he admonished
defendants for providing "little in the way of support for their
motion of summary judgment" and relying on documentary evidence
and plaintiff's deposition, as well as plaintiff for submitting
disorganized exhibits.  Id. at *15.  Judges throughout this
District since have agreed with Judge Simandle's position, even
after the 2008 amendments became effective.  E.g., Langan Eng'g &
Envtl. Servs. v. Greenwich Ins. Co., 2008 U.S. Dist. LEXIS 99341
(D.N.J. 2008) (Greenaway, J.); Apata v. Howard, 2008 U.S. Dist.
LEXIS 72321 (D.N.J. 2008) (Irenas, J.).

IV.  SECTION 1983 ACTIONS

A plaintiff may have a cause of action under 42 U.S.C.
§ 1983 for certain violations of his constitutional rights.
Section 1983 provides in relevant part:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory ... subjects, or causes to be subjected,
> any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other
proper proceeding for redress ... .

Thus, to state a claim for relief under § 1983, a plaintiff must
allege, first, the violation of a right secured by the
Constitution or laws of the United States and, second, that the
alleged deprivation was committed or caused by a person acting
under color of state law.  West v. Atkins, 487 U.S. 42, 48
(1988); Piecknick v. Pennsylvania, 36 F.3d 1250, 1255-56 (3d Cir.
1994).

    "A defendant in a civil rights action must have personal
involvement in the alleged wrongs ... .  Personal involvement can
be shown through allegations of personal direction or of actual
knowledge and acquiescence."  Rode v. Dellarciprete, 845 F.2d
1195, 1207 (3d Cir. 1988) (citations omitted).  Accord Robinson
v. City of Pittsburgh, 120 F.3d 1286, 1293-96 (3d Cir. 1997);
Baker v. Monroe Twp., 50 F.3d 1186, 1190-91 (3d Cir. 1995).

V.   ANALYSIS

A.   The 2008-2009 Transfer to TPH

    Plaintiff alleges that Defendants Evan Feibusch and Lawrence
Rossi delayed his transfer to Trenton Psychiatric Hospital, in
violation of his due process rights, because of his litigious
reputation and in retaliation for his litigation reputation, as
evidenced by the fact that other, unnamed, allegedly similarly-
situated or more dangerous patients, were transferred in less
time.

"Due process requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed." <u>Foucha v. Louisiana</u>, 504 U.S. 71, 79 (1992) (citing <u>Jones v. United States</u>, 463 U.S. 354, 368 (1983); <u>Jackson v. Indiana</u>, 406 U.S. 715, 738 (1972)). <u>See also</u> <u>Youngberg v. Romeo</u>, 457 U.S. 307, 324 (1982) and <u>Jackson v. Indiana</u>, 406 U.S. 715, 738 (1972)).

In <u>Youngberg v. Romeo</u>, 457 U.S. 307 (1982) the Supreme Court evaluated the substantive Fourteenth Amendment liberty interests retained by civilly-committed mental patients, in freedom from unnecessary restraints.  The Court held that involuntarily committed mentally retarded persons retain substantive liberty interests in adequate food, shelter, clothing, and medical care, <u>Youngberg</u>, 457 U.S. at 315, as well as in safety, freedom of movement, minimally adequate or reasonable training to ensure safety, and freedom from undue restraint, <u>id.</u> at 317-19.

These interests, however, are not absolute.  <u>Youngberg</u>, 457 U.S. at 319-20.  "In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance "the liberty of the individual" and "the demands of an organized society."  <u>Id.</u> at 320 (quoting <u>Poe v. Ullman</u>, 367 U.S. 497, 542 (1961)(Harlan, J., dissenting)).  In seeking this balance, a court must weigh "the individual's interest in liberty against the State's asserted reasons for

restraining individual liberty."  Id.  In Youngberg, balancing
the interests of the State against the rights of involuntarily
committed mentally retarded persons to reasonable conditions of
safety and freedom from unreasonable restraints, the Court
adopted the standard advocated by a concurring judge, below, that
"the Constitution only requires that the courts make certain that
professional judgment in fact was exercised.  It is not
appropriate for the courts to specify which of several
professionally acceptable choices should have been made."  487
U.S. at 321 (quoting 644 F.2d 147, 178 (3d Cir. 1980) (Seitz,
C.J., concurring)).  Thus, even when treatment decisions violate
a protected liberty interest, such decisions made by a qualified
professional are presumptively valid;

> liability may be imposed only when the decision by the
> professional is such a substantial departure from
> accepted professional judgment, practice, or standards
> as to demonstrate that the person responsible actually
> did not base the decision on such a judgment.  In an
> action for damages against a professional in his
> individual capacity, however, the professional will not
> be liable if he was unable to satisfy his normal
> professional standards because of budgetary
> constraints; in such a situation, good-faith immunity
> would bar liability.

457 U.S. at 323 (footnote omitted).

Following Youngberg, the Court of Appeals for the Third
Circuit held that mental patients have a liberty interest arising
under the Fourteenth Amendment to refuse treatment with
psychotropic drugs and that the Youngberg standard is applicable

28

to the decision to forcibly administer psychotropic drugs against the will of an involuntarily committed mental patient.  <u>See</u> <u>Rennie v. Klein</u>, 720 F.2d 266 (3d Cir. 1983).

Although the Supreme Court delineated in <u>Youngberg</u> certain substantive liberty interests that arise directly under the Fourteenth Amendment, other liberty interests may be created by state law.  <u>See</u> <u>Hewitt v. Helms</u>, 459 U.S. 460, 466 (1983); <u>Asquith v. Department of Corrections</u>, 186 F.3d 407, 409 (3d Cir. 1999).

Pursuant to N.J.S.A. 30:4-24.2(e)(2), each patient committed to a mental institution in New Jersey has the right to be committed "to the least restrictive conditions necessary to achieve the purposes of the treatment."  The U.S. Court of Appeals for the Third Circuit has previously found that the provisions of Title 30 of the New Jersey Revised Statutes generally "suggest a state right to reasonable care."  <u>Scott v. Plante</u>, 691 F.2d 634, 638 (3d Cir. 1982) (finding that New Jersey law provides a state right to reasonable care pursuant to N.J.S.A. 30:4-24.2(e)(1)).  The <u>Scott</u> Court stated further that "[i]t is public policy of the state to provide adequate residential facilities for the treatment of mental illness" and that this policy gives rise to "explicit patient rights granted in Title 30."  <u>Id.</u>

29

To prevail on a retaliation claim, a plaintiff must demonstrate that (1) he engaged in constitutionally-protected activity; (2) he suffered, at the hands of a state actor, adverse action "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights;" and (3) the protected activity was a substantial or motivating factor in the state actor's decision to take adverse action. Rauser v. Horn, 2001 WL 185120 (3d Cir. 2001) (quoting Allah, 229 F.3d at 225). See also Anderson v. Davila, 125 F.3d 148, 160 (3d Cir. 1997) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274 (1977)); Thaddeus-X v. Blatter, 175 F.3d 378, 386-99 (6th Cir. 1999), cited with approval in Allah, 229 F.3d at 225.

All citizens have a right under the First Amendment to petition the courts for redress of grievances; retaliation for exercise of that right is an actionable constitutional tort. See, e.g., Peterkin v. Jeffes, 855 F.2d 1021, 1036 (3d Cir. 1988); Goldhaber v. Higgins, 576 F.Supp.2d 694 (W.D.Pa. 2007). In this context, such retaliation would also demonstrate that the delay in transfer from AKFC to TPH was not based on the exercise of professional judgment, as required by the Due Process Clause of the Fourteenth Amendment.

Here, the undisputed evidence is that, as of early 2009, when Plaintiff was awaiting transfer from AKFC to TPH, the Defendants Evan Feibusch and Lawrence Rossi were aware of at

30

least one prior civil rights action by Plaintiff regarding his treatment as a civilly-committed mental patient in New Jersey and that Dr. Feibusch had appeared as an expert witness in that case. In addition, it is undisputed that there existed a court order dated January 16, 2009, that provided for Plaintiff's remand to the Ann Klein Forensic Center "until such time as his case is approved by the Clinical Administrative Review Panel for transfer" to a psychiatric hospital with a less restrictive setting "as soon as possible."[12]

The January 16, 2009, order did not provide for transfer immediately or specifically to TPH.[13]  Further, the undisputed evidence provided to this Court establishes that the Clinical Administrative Review Panel evaluated Plaintiff and approved his transfer on January 27, 2009.

Trenton Psychiatric Hospital staff received notice of the transfer decision on January 30, 2009, and Dr. Feibusch and Dr. Rossi requested a review of that decision six days later, on February 5, 2009.  The stated reasons for the review request were

---

[12] Plaintiff asserts that there was an earlier order in late 2008, but he does not provide a copy of that order or quote its terms.  In any event, there is no evidence before the Court that the Clinical Administrative Review Panel approved a transfer before January 27, 2009, or that a transfer decision was communicated to staff at TPH before January 30, 2009.

[13] This Court will take judicial notice of the fact that the New Jersey Division of Mental Health Services manages four adult psychiatric hospitals in addition to Ann Klein Forensic Center.

31

incidents involving Plaintiff at AKFC on December 21, 2008, in which Plaintiff allegedly assaulted a peer, and on January 23, 2009, which resulted in Plaintiff being placed in seclusion.  Dr. Rossi and other TPH and AKFC staff met with Plaintiff on March 2, 2009, and provided a report of their interview to CARP on March 4, 2009.  On March 11, 2009, CARP communicated to TPH their final decision to transfer Plaintiff there and the transfer was accomplished six days later, on March 17, 2009.

Here, the only facts asserted by Plaintiff in support of his claim that his constitutional rights to due process were violated by the delay in his transfer are that the two named defendants were aware of his litigation history and one had appeared as an expert witness in one case.  However, the mere temporal association between his litigation and the alleged delay in his transfer is not sufficient to demonstrate that the litigation was a motivating factor in the Defendants' actions or to raise his claims above a mere "speculative" level.  Cf. Gans v. Rozum, No. 06-62J, 2007 WL 257127, *6 (W.D. Pa. Aug. 31, 2007) (mere temporal connection between filing of civil rights complaint and exercise restriction is "too thin a reed" on which to hang a retaliation claim), aff'd, 267 Fed.Appx. 178 (3d Cir.) (unpubl.), cert. denied, 129 S.Ct. 84 (2008); Lopez v. Beard, No. 08-3699, 2009 WL 1705674 (3d Cir. June 18, 2009) (allegation of that

32

denial of visitation on two occasions was in retaliation for filing grievances is frivolous).

Nor does the passage of time from January 30, 2009, to March 17, 2009, a period of approximately six weeks, during which time CARP was reviewing the propriety of Plaintiff's transfer, based upon Defendants Rossi's and Feinbusch's request referencing two violent outbursts a short period before, constitute either a deprivation of Plaintiff's right to treatment in the least restrictive setting or adverse action sufficient to deter a person of ordinary firmness from exercising his rights. Accordingly, the Amended Complaint fails to state a claim either for deprivation of due process or retaliation based upon the activities of Dr. Feibusch or Dr. Rossi in connection with Plaintiff's 2009 transfer from AKFC to TPH.

In the alternative, the undisputed facts demonstrate that these Defendants' activities in requesting a review of the proposed transfer were not "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  Defendants Drs. Rossi and Feibusch are entitled to summary judgment with respect to these claims related to the transfer from AKFC to TPH.

B.   <u>The 2010 Internal Transfer to the Intensive Treatment Unit</u>

Plaintiff alleges that all defendants conspired to deprive him of his due process right to treatment in the least restrictive setting, and to retaliate against him for his grievances and litigation, by transferring him to the Intensive Treatment Unit, where conditions were more restrictive, and where he would not have access to his computer and printer.[14]

As an initial matter, Plaintiff has failed to allege <u>any</u> facts from which "conspiracy" or agreement could be inferred.  On this ground alone, the Amended Complaint fails to state a claim for conspiracy (a) to deprive Plaintiff of a liberty interest without due process or (b) to retaliate against him based upon his reputation for filing grievances or litigation.

As noted above, New Jersey law provides that involuntarily-committed mental patients have a right to be committed "to the least restrictive conditions <u>necessary to achieve the purposes of the treatment</u>," N.J.S.A. 30:4-24.2(e)(2) (emphasis added), not an absolute right to be committed to the least restrictive conditions available within the mental-health system or a particular hospital.  According to the allegations of the Amended

_____

[14] Plaintiff also alleges that Evan Feibusch violated his due process rights by transferring him to the ITU without personally examining him, as allegedly required by N.J.S.A. 30:4-24.2d(3).  That provision, however, requires such a personal examination only prior to the imposition of isolation or physical restraints, and has no application to the type of internal transfer described in the Amended Complaint.

Complaint, Plaintiff was experiencing more frequent and
increasingly aggressive incidents of conflict with the staff in
Raycroft East-2.  While Plaintiff did experience the loss of a
private room and bath, as well as some personal property, as the
result of the transfer to the ITU, he does not allege facts that
establish a violation of his liberty interest by virtue of these
minimal and temporary changes in his environment.  Again, also,
these changes in environment are not so severe that they would
deter a person of ordinary firmness from exercising his
constitutional rights.  Moreover, Plaintiff alleges that he
became violent almost immediately upon his transfer, making it
impossible to determine the duration for which he would have been
subjected to these changes, so his allegations regarding loss of
access to his personal property, loss of a private room and bath,
and access to treatment programs while confined in the ITU are
insufficient to raise his claims regarding those aspects of his
treatment above a speculative level.  Thus, the Complaint fails
to state a claim for constitutional violations in connection with
the internal transfer to ITU.

Finally, the undisputed evidence reflects that the transfer
resulted from Plaintiff's progressively aggressive conflict with
staff and patients and that Defendant Evan Feibusch approved the
transfer to ITU only if the treatment team felt it was clinically
indicated.  There is no evidence whatsoever that Plaintiff's

35

grievances and litigation were a factor in the decision to transfer Plaintiff internally.  Accordingly, Defendants are entitled to summary judgment with respect to this claim.

C.   The False Incident Report

Plaintiff alleges that Nurse Akajabi wrote a false incident report, accusing him of threatening her, in retaliation for grievances and in violation of her Fourteenth Amendment duty to exercise professional judgment in making treatment decisions regarding him.  Plaintiff states that he was not threatening Nurse Akajabi, but that he was talking to other patients about a previous incident at AKFC.  Plaintiff also asserts, and the medical records confirm, that another staff member advised Jackie Porter that Plaintiff was excited, but not threatening.

Defendant correctly points out that Plaintiff does not allege that he suffered any adverse action based upon this allegedly false incident report, that is, that any treatment decision was, in fact, based upon this report.  Thus, the Amended Complaint fails to state a claim either for deprivation of a liberty interest without due process, as there is no allegation of a deprivation of a liberty interest at all, or for retaliation, as there is no allegation that Plaintiff suffered adverse consequences.

To the extent the Amended Complaint could be construed as asserting that the 2010 internal transfer decision was based in

36

some degree on the allegedly false incident report, there is no

evidence to support that contention.  To the contrary, the

evidence presented reflects that the incident report was

investigated and that Jackie Porter took note that another staff

member disputed the suggestion that Plaintiff had been

threatening to Nurse Akajabi.  There is no evidence that this

particular incident report, as opposed to the several incidents

of conflict with staff and patients otherwise noted in the

medical records, contributed to the decision to transfer

Plaintiff to the Intensive Treatment Unit.  Nor, as noted

previously, is there any evidence that the decision to transfer

Plaintiff was not based on appropriate professional judgment, or

that the ITU was not the "least restrictive setting" appropriate

to achieve the objectives of commitment at that time, or that the

conditions in the ITU to which Plaintiff was subjected were so

adverse that they would deter a person of ordinary firmness from

exercising his constitutional rights.  Nurse Akajabi is entitled

to summary judgment on this claim.

VI.   CONCLUSION

    For the reasons set forth above, this Court will grant the

Motion to Dismiss or, in the alternative, will grant the

Defendants summary judgment.  An appropriate order follows.

s/Freda L. Wolfson
Freda L. Wolfson
United States District Judge

Dated: May 29, 2012

37